**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 00-cv-00379-REB-CBS

SAN JUAN CITIZENS' ALLIANCE,
SOUTHERN UTE GRASSROOTS ORGANIZATION.

      Plaintiffs,

v.

KEN SALAZAR, Secretary, United States Department of the Interior; and the
UNITED STATES BUREAU OF LAND MANAGEMENT,

      Defendants,

and

SOUTHERN UTE INDIAN TRIBE, and
AMOCO PRODUCTION COMPANY,

      Intervenors.

---

## ORDER

---

**Blackburn, J.**

      The matter before me is plaintiffs San Juan Citizens' Alliance's ("SJCA") and

Southern Ute Grassroots Organization's ("SUGO") **Petition for Review of Agency**

**Action** [#158], filed October 21, 2005.  I affirm the administrative decision.

## I.  JURISDICTION

      I have jurisdiction over this matter under 28 U.S.C. § 1331 (federal question) and

5 U.S.C. § 706(2)(A) (review of final agency action).

## II.  STANDARD OF REVIEW

Plaintiffs assert challenges to defendants' actions under both the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA").  However, as neither NEPA nor FLPMA creates a private right of action, *see State of Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998), plaintiffs must bring their claims pursuant to the judicial review procedures of the Administrative Procedure Act ("APA").

The APA instructs that federal agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observation of procedure required by law."  5 U.S.C. §§ 706(2)(A) & (D).  "In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment."  *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999) (quoting *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir. 1997)) (additional citations, internal quotation marks, and alterations omitted).  However, a court may not substitute its judgment for that of the agency nor set aside the decision merely because it disagrees with the result.  *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 1856, 1866-67, 77 L.Ed.2d 443 (1983); *Baltimore Gas and Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983).  Rather, the court may only find a decision arbitrary and capricious

> if the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Friends of the Bow*, 124 F.3d at 1215 (quoting *Motor Vehicle Manufacturers Association*, 103 S.Ct. at 1866) (internal quotation marks omitted). Though a court must engage in a "substantial inquiry," *Lamb v. Thompson*, 265 F.3d 1038, 1046 (10th Cir. 2001), that is "searching and careful," *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989), "the ultimate standard of review is a narrow one," *id.*

## III. ANALYSIS

The present petition for review of final agency action emanates from defendants'[1] promulgation of a final Environmental Impact Statement ("FEIS") concerning oil and gas development on the Southern Ute Indian Reservation ("SUIR"), issued in August 2002. SJCA, a non-profit corporation involved in monitoring certain oil and gas development activities, and SUGO, a tribal organization dedicated to educating and empowering members of the Southern Ute Indian Tribe ("the Tribe"), challenge particularly the FEIS's consideration of coalbed methane ("CBM") extraction activities on the SUIR lands.[2]

---

[1] At the time the Petition was filed, Gale Norton was the United States Secretary of the Interior. Former United States Senator Ken Salazar was confirmed as Secretary of the Interior on January 20, 2009. Thus, he is automatically substituted as the defendant in this suit. FED.R.CIV.P. 25(d)(1).

[2] Plaintiffs originally claimed that defendants failed to conduct the necessary environmental review of the increased CBM activity on the SUIR. However, following the publication of the SUIR FEIS, plaintiffs revised their position and now attack the sufficiency of that statement.

The SUIR, located in southwestern Colorado, encompasses approximately 685,000 acres, or 1,070 square miles, in the southern parts of La Plata and Archuleta counties, with a small tract in Montezuma County.  (FEIS at 1-6.)[3]  The SUIR is located within the San Juan Basin, which stretches from northwestern New Mexico to southwestern Colorado.  (*Id.* at 1-1.) The Basin is reportedly the second-largest gas-producing basin in the continental United States; at the time of the publication of the FEIS, there were more than 26,000 wells in the entire Basin, including more than 2,000 wells within the SUIR.  (*Id.* at 1-1, 1-3.)  Historically, revenues from oil and gas development have been the major source of income for the Southern Ute Tribe.  (*Id.* at 1-1.)

Along with more conventional forms of oil and natural gas, the Basin contains "tremendous reserves" of CBM.  (*Id.* at 1-3.)  Because of problems associated with the extraction of coal gas, CBM was originally considered uneconomical to produce. However, with the passage of legislation in the 1980s offering "lucrative tax incentives to explore unconventional fuel production," the oil and natural gas industry began investing in ways to mine CBM.  By the late 1990s, the Basin had produced over six trillion standard cubic feet of CBM – more than eight times the production of the second-ranked field in the continental United States.  Indeed, production in the Basin "rival[ed] or exceed[ed] CBM production from any basin worldwide to date."  (***Coalbed Methane Development in the Northern San Juan Basin of Colorado: A Brief History and***

<hr />

[3]  The FEIS is numbered by reference to chapter and page number.  Thus, for example, "1-6" refers to chapter 1, page 6.  The FEIS was provided to this court in both electronic form and hard copy. While it appears that the two forms are identical, I note that citations to the FEIS are to the two-volume hard copy.

***Environmental Observations***, Bureau of Land Management, San Juan Field Office, December, 1999, ***available at*** http://cogcc.state.co.us/ at "History of Oil and Gas Exploration and Development in the San Juan Basin" [hereinafter "History."][4]

The mining of CBM poses certain unique issues because "[u]nlike conventional reservoirs, where methane gas is stored in the pore spaces of the formation, considerable [CBM] is stored on (adsorbed to) the surfaces of the coal matrix and is not free to migrate until pressure is relieved." (***Id.*** at "Introduction") Pressure is typically relieved by withdrawing water from the coalbed. Extraction of CBM is accomplished in one of several ways. One method – cavitation – involves creating a cavity in the targeted coal seams, effectively enlarging the well bore and linking it with the natural fracture system of the coalbeds. Another method requires hydraulically fracturing the coal by pumping water or other liquid at high pressure into the beds. When these conventional pressure depletion methods do not work, "enhanced production techniques have been applied." (***Id.***) One such technique involves introducing nitrogen under high pressure into the coalbeds, which essentially displaces the methane and allows for its extraction. (***Id.*** at "Coalbed Methane Reservoir".) These extraction methods are suspected of contributing to environmental problems such as natural gas resource losses, methane migration into surface soils and groundwater, and vegetation mortality. (***Id.*** at "Introduction".)

Prior to the issuance of the FEIS that is the subject of the present challenge, oil and gas development on the SUIR was guided by a 1990 Environmental Assessment

---

[4] Although this document was not submitted with the administrative record, defendants have apparently conceded that it is an agency document and, therefore, properly part of the record.

("EA").[5]  (Administrative Record ("AR"), CD 2, Doc. 916.)[6]  The EA assessed the

continued leasing and permitting for the purpose of exploring and producing natural gas

and CBM.  The EA found that this proposed action – which it estimated would result in

400-500 new wells – would not have a significant environmental impact and that

therefore a full EIS was not required.  (*Id.* at 006385, 006395)

Nevertheless, the BLM, the Bureau of Indian Affairs ("BIA"), and the Tribe

eventually determined that additional data were in fact needed to assess potential

impacts from CBM development.  (FEIS at 1-4.)  In September, 1995, a Notice of Intent

to prepare an EIS was published in the Federal Register.  (*Id.* at 1-12.)  During the initial

"scoping period," comments were solicited to identify issues and concerns.  (*Id.*; *see*

*also* AR CD 1, Doc. 189, at 1114.)  A draft EIS was released for comment in January,

2001.  (FEIS at 1-12; *see also* AR CD 1, Doc 189, at 1115.)  The FEIS was officially

released on August 30, 2002.  (AR CD 1, Doc 189, at 1115.)  After reviewing comments

both supportive and critical of the FEIS, the BLM and the BIA determined that all issues

raised had been satisfactorily addressed.  (*Id.*)

The stated purpose of the FEIS was primarily to "provide agency

decisionmakers, the [Tribe], and the general public with a comprehensive analysis and

understanding of oil and gas resource-development alternatives on the Reservation,

including CBM development, and their existing and potential future impacts."  (FEIS at

---

[5]  There are two types of environmental review documents contemplated by NEPA:  an EA and an EIS.  An EA is a concise document whose purpose is to "[b]riefly provide sufficient evidence and analysis" for determination of whether a more thorough EIS is needed.  40 C.F.R. § 1508.9.

[6]  The bulk of the administrative record in this case was submitted to the court on several compact discs.  Citation to the administrative record therefore will reference the CD number, document number, and page number, where appropriate.

1-5.)  To that end, the FEIS considered a number of development alternatives.  The alternative preferred by the agencies and the Tribe – the so-called "enhanced coalbed methane recovery" alternative – contemplated drilling 636 wells (269 conventional wells and 367 CBM wells) along with "the addition of [enhanced coalbed methane] recovery through injection of nitrogen, carbon dioxide, or other fluids" by way of "injector wells." (*Id.* at 2-10 to 2-11.)  In the judgment of the agencies, this alternative best met the federal government's responsibility to take actions in the best interest of the Tribe by promoting continued development of oil and gas on the SUIR lands.  (*Id.* at 2-11.)  In October, 2002, the BLM and the BIA signed the "Record of Decision" formally approving their preferred alternative.  (AR CD 1, Doc 189.)

The SUIR FEIS is a "programmatic" EIS, intended to predict impacts over a large scale before the exact locations of any specific development sites are determined. Management of the oil and gas development thus proceeds in two stages – the programmatic FEIS provides a broader analysis, which is then supplemented by site-specific proposals that require their own evaluation.  The SUIR FEIS itself does not permit any site-specific development.  (AR CD 1, Doc 189, at 1107-08.)

As noted in the SUIR FEIS, the other portions of the Basin – in Colorado north of the SUIR, and in New Mexico south of the SUIR – are covered by their own separate EISs.  (FEIS at 2-8.)  At the time of the publication of the SUIR FEIS, the relevant agencies were in the process of revising these analyses to account for future oil and gas development in these respective portions of the Basin.  (*See id.*)  It is this decision to segment the Basin and perform regional analyses that lies at the heart of plaintiffs'

legal challenge.

## A.  STANDING

As a threshold matter, defendants contend that plaintiffs have failed to adequately prove their standing to challenge the FEIS.  Although acknowledging this Court's previous rulings that plaintiffs had sufficiently alleged standing (*see* **Order Denying Defendant Babbitt and United States Bureau of Land Management's Motion to Dismiss** [#83], filed September 16, 2002; **Order Denying Defendant/Intervenor's Motion to Dismiss** [#85], filed October 4, 2002), defendants argue that at this stage of the proceeding, plaintiffs must substantiate their allegations of standing with affirmative evidence.  This argument rests on the rule articulated in ***Lujan v. Defenders of Wildlife***, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), that standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation," ***id.***, 112 S.Ct. at 2136.  In other words, even though "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," when a case reaches the summary judgment stage, a plaintiff "must 'set forth' by affidavit of other evidence 'specific facts'" demonstrating standing.  ***Id.*** at 2137.

Defendants do not explain why they believe this case has entered the stage at which affirmative evidence supporting standing is required.  This case is a review of agency action, which does not necessarily track the typical civil litigation process – complaint, summary judgment, trial – outlined in ***Lujan***.  ***See id.*** at 2136-27; ***cf.***

***Olenhouse v. Commodity Credit Corp.***, 42 F.3d 1560, 1580 (10th Cir. 1994) ("Reviews of agency action in the district courts must be processed as appeals. . . . Motions to affirm and motions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal."). The parties do not cite any Tenth Circuit or Supreme Court precedent outlining the burdens that apply to such a review.[7]

On the other hand, plaintiffs have not challenged defendants' contention that summary judgment-type evidence is required. Instead, in response to defendants' argument, plaintiffs submitted the declaration of Dan Randolph, a member of the SJCA ("Randolph Declaration"), which contains facts pertinent to the standing issue.[8] I will therefore assume *arguendo* that such evidence is required and review the evidence proffered to determine whether plaintiffs have sufficiently established standing to assert

---

[7] The Court of Appeals for the District of Columbia Circuit, whose docket involves a substantial number of administrative review cases, has created a rule requiring a plaintiff to submit evidence to support its standing "at the first appropriate point in the review proceeding." ***Sierra Club v. Environmental Protection Agency***, 292 F.3d 895, 900 (D.C. Cir. 2002). While recognizing that administrative proceedings do not fit neatly into the ***Lujan*** "stages of the litigation" boxes, ***see id.*** at 899 (noting that an administrative agency "is not subject to Article III of the Constitution" and thus "the petitioner would have had no need to establish its standing to participate in the proceedings before the agency"), the court analogized review of agency action to a motion for summary judgment in the sense that both ask for "a final judgment on the merits, based upon the application of [a party's] legal theory to facts established by evidence in the record." ***Id.*** at 900. For that reason, the court engrafted ***Lujan's*** summary judgment evidentiary burdens onto the administrative review process. ***Id.***

At least one other circuit has followed this approach. ***See Citizens Against Ruining The Environment v. Environmental Protection Agency***, 535 F.3d 670, 675 (7th Cir. 2008) ("Because we are reviewing the decision of an administrative agency, which is not subject to Article III, the petitioner's burden of production on standing is the same as that of a plaintiff moving for summary judgment in the district court: she must support each element of her claim by affidavit or other evidence.").

[8] The declaration was not an attempt to raise new issues, but rather was submitted in direct response to defendants' argument. Moreover, no party has moved to challenge the declaration or sought leave to file a surreply. Thus, while arguments and evidence raised in a reply brief are typically not considered, I find it appropriate to do so in this instance. ***See Pippin v. Burlington Resources Oil & Gas Co.***, 440 F.3d 1186, 1191-92 & n.5 (10th Cir. 2006).

their claims.[9]

The doctrine of standing "'involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise.'" ***Babbitt***, 137 F.3d at 1201 (quoting ***Bennett v. Spear***, 520 U.S. 154, 162, 117 S.Ct. 1154, 1161, 137 L.Ed. 2d 281 (1997)). Constitutional standing requires plaintiffs to show

> an injury in fact, defined as the invasion of a legally
> protected interest which is (a) concrete and particularized,
> and (b) actual or imminent, not conjectural or hypothetical. A
> plaintiff must also show a causal connection between the
> injury and the conduct. And finally, a plaintiff must
> demonstrate that it must be likely, as opposed to merely
> speculative, that the injury will be redressed by a favorable
> decision.

***The American Civil Liberties Union of New Mexico v. Santillanes***, 546 F.3d 1313, 1318 (10th Cir. 2008) (internal citations and quotation marks omitted). Further, because plaintiffs' claims arise under the APA, they must satisfy the APA's statutory standing requirements. ***See Babbitt***, 137 F.3d at 1203. The APA requires plaintiffs to show both that (1) there has been some "final agency action;" and (2) their claims "fall within the zone of interests protected by the statute forming the basis of [their] claims." ***See id.*** (quoting ***Catron County Board of Commissioners, New Mexico v. United States Fish & Wildlife Service***, 75 F.3d 1429, 1434 (10th Cir. 1996)). The "zone of interest" test is "not meant to be especially demanding," and exists only to prevent a plaintiff

---

[9] Although defendants do not raise any substantive challenge to plaintiffs' standing, I must still determine whether standing exists. ***See, e.g., Habecker v. Town of Estes Park***, 452 F.Supp 2d 1113, 1121-22 (D. Colo. 2006) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines.") (quoting ***FW/PBS, Inc. v. City of Dallas***, 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) (internal quotation marks and citation omitted; alteration in original)), ***aff'd***, 518 F.3d 1217 (10th Cir. 2008).

whose interest is "so marginally related to or inconsistent with the purposes implicit in the [underlying] statute" from bringing suit. ***Clarke v. Securities Industry Association***, 479 U.S. 388, 399-400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987).        Finally, I note three important principles concerning proof of standing. First, where, as here, associations bring claims on behalf of their members, the doctrine of "associational standing" requires the association to show not only that at least one of its members would otherwise have standing to sue on her own, but also that the interests the association seeks to protect are "germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." ***Utah Association of Counties v. Bush***, 455 F.3d 1094, 1099 (10th Cir. 2006) (citing ***Hunt v. Washington State Apple Advertising Commission***, 432 U.S. 333, 342-43, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). ***See also Warth v. Seldin***, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211-12, 45 L.Ed.2d 343 (1975). Second, so long as either one of the associational plaintiffs in this case demonstrates standing, I need not consider the standing of the other. ***See, e.g.***, ***Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls***, 536 U.S. 822, 826 n.1, 122 S.Ct. 2559, 2563 n.1, 153 L.Ed.2d 735 (2002); ***Bowsher v. Synar***, 478 U.S. 714, 721, 106 S.Ct. 3181, 3185, 92 L.Ed.2d 583 (1986).[10]

---

[10] The Tenth Circuit has occasionally stated that each plaintiff must demonstrate standing. ***See, e.g.***, ***Tandy v. City of Wichita***, 380 F.3d 1277, 1284 (10th Cir. 2004) ("[T]his court proceeds to analyze each appellant's standing to pursue each claim of relief."). However, ***Tandy*** involved a challenge to the city of Wichita's compliance with federal disability laws, and each of the multiple plaintiffs there presented unique facts concerning his individual disabilities and his use of the city's transit system. ***See id.*** at 1284-90. Further, each plaintiff sought particular, individualized relief, including damages. ***See id.*** at 1280. Here, by contrast, plaintiffs present a united front in challenging defendants' actions, advance the same legal arguments, and seek the same relief. In these circumstances, the Supreme Court's "one plaintiff" standing rule is appropriate. ***See Earls***, 122 S.Ct. at 2562-63; ***Bowsher***, 106 S.Ct. at 3184; ***Secretary of***

Third, because standing is a claim-by-claim inquiry, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." ***Davis v. Federal Election Commission***, — U.S. —,128 S.Ct. 2759, 2769, 171 L.Ed.2d 737 (2008) (quoting ***DaimlerChrysler Corp. v. Cuno***, 547 U.S. 332, 352, 126 S.Ct. 1854, 1867, 164 L.Ed.2d 606 (2006)) (internal quotation marks omitted).

The latter two elements of the associational standing doctrine are easily met in this case. The environmental interests plaintiffs seek to protect are certainly germane to their organizational missions. (***See*** Second Am. Compl. ¶ 17 (noting that SJCA "has been interested in and involved in CBM development for several years as a watchdog organization"); ***id.*** ¶ 18 (noting that SUGO's mission includes educating and empowering tribal members on decisions affecting environmental policies). (***See also*** Randolph Declaration ¶ 5 (noting that SJCA's mission includes "organiz[ing] for environmental . . . justice")). Further, FLPMA and NEPA claims are routinely asserted at the associational level, ***see, e.g.***, ***Lujan v. National Wildlife Federation***, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), and there is no suggestion that individual member involvement is necessary in this case. Thus, I must determine only whether plaintiffs have shown that they themselves, or at least one of their members, have constitutional and statutory standing.

Plaintiffs' petition asserts two distinct claims: (1) that the FEIS violates NEPA for failing to assess the cumulative impacts of Basin-wide CBM production activity and

---

*the Interior v. California*, 464 U.S. 312, 319 & n.3, 104 S.Ct. 656, 660 & n.3, 78 L.Ed.2d 496 (1984). ***See also Bronson v. Swensen***, 500 F.3d 1099, 1106 (10th Cir. 2007) (stating that "[e]ach plaintiff must have standing to seek each form of relief in each claim" but analyzing standing collectively because "each plaintiff asserts the same injury-in-fact").

failing to properly analyze alternatives to the selected course of action; and (2) that the current CBM development is beyond the scope of the statutorily-mandated resource management plan and thus violates FLPMA. I examine plaintiffs' standing to assert each of these claims. *See Davis*, 128 S.Ct. at 2769.[11]

## 1. NEPA

Unlike many statutory claims, which challenge the results of certain actions, the gravamen of a NEPA claim is simply that an agency failed to follow the requisite procedures in reaching its decisions. *See, e.g.*, *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996) (noting that although NEPA "does not mandate the particular decisions an agency must reach, it does mandate the necessary process the agency must follow"). Where, as here, plaintiffs challenge the agency's decision on the ground that it failed to follow NEPA's procedures, plaintiffs will have constitutional standing if they establish the existence of an injury-in-fact, causation, and redressability. *See id.* at 448-52. I address these factors *seriatim*.

SJCA's declaration provides evidence sufficient to demonstrate injury-in-fact. Injury-in-fact occurs when the agency created an increased risk of actual, threatened, or imminent environmental harm by failing to follow NEPA procedures, which injured plaintiffs' concrete interests. *See id.* at 449. SJCA member Randolph asserts that

---

[11] Plaintiffs also request relief in two forms: a declaration that the FEIS violates NEPA, and an injunction barring ongoing and future oil and gas development. However, both these forms of prospective relief essentially seek the same thing – a cessation of CRM extraction activities until the necessary environmental reviews are completed. On these facts, there is no need to separately analyze the requested relief. *See Bronson*, 500 F.3d at 1107 (finding that plaintiffs' request for an injunction and for declaratory judgment "trigger the same standing analysis"); *see generally Tandy*, 380 F.3d at 1284-90 (dividing standing analysis between "prospective relief," i.e., injunctive and declaratory relief, and "damages").

defendants are continuing to permit expanded CBM production using "environmentally harmful production methods" and notes the "adverse environmental impacts which arise from the [defendants'] implementation of [their] CBM production program in the northern San Juan Basin, without the benefit of required programmatic NEPA analysis." (Randolph Declaration ¶¶ 10 & 14.)  *See Rio Hondo*, 102 F.3d at 450 (plaintiffs demonstrated increased risk of harm through affidavits noting that agency's uninformed decisionmaking would affect water consumption and river quality).

Further, Randolph avers that many SJCA members live within the boundaries of the SUIR and that he personally has "participated in efforts to protect and preserve the exact tracts of public land affected by the Secretary's ongoing oil and gas developments."  (Randolph Declaration ¶¶ 5 & 9.)  This demonstrates SJCA's "geographical nexus to" and "actual use of" the SUIR.  *See, e.g.*, *Sierra Club v. United States Department of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002) (organization established geographic nexus where it demonstrated that its members worked to protect the area and had used the area for recreational and educational purposes).[12]

Plaintiffs also have established causation.  Causation requires a party to show

---

[12]  In their reply brief, plaintiffs assert other injuries, including harm to their use and enjoyment of the land surrounding the SUIR and "informational injury" stemming from defendants' failure to conduct a proper environmental analysis.  Given the Tenth Circuit's specific NEPA standing analysis, which focuses on the "procedural injury" inherent in a NEPA violation, and given my finding that plaintiffs have sufficiently evidenced such an injury, I need not address such alternative theories.

I would note, however, that it is doubtful whether plaintiffs have suffered the "informational injury" they allege.  The cases cited by plaintiffs arise from the complete absence of an EIS or EA.  *See, e.g.*, *Heartwood, Inc. v. United States Forest Service*, 230 F.3d 947, 952 (7th Cir. 2000); *Competitive Enterprise Institute v. National Highway Traffic Safety Administration*, 901 F.2d 107, 122 (D.C. Cir. 1990); *Colorado Environmental Coalition v. Lujan*, 803 F.Supp. 364, 367 (D. Colo. 1992).  Here, by contrast, an EIS was issued, meaning information was provided.  Plaintiffs claim only that the EIS was insufficient.  This situation is not obviously analogous to the informational injury cases referenced above.

that its injury is fairly traceable to the complained-of conduct.  *See Babbitt*, 137 F.3d at

1202.  "The plaintiff's burden of demonstrating traceability is fairly low where the

plaintiff's injury in fact consists of a procedural injury under NEPA."  *Wyoming v.*

*United States Department of Agriculture*, 570 F.Supp.2d 1309, 1328 (D. Wyo. 2008).

This is because "the plaintiff need only trace the risk of harm to the agency's alleged

failure to follow [NEPA's] procedures.  Under [NEPA], an injury results not from the

agency's decision, but from the agency's uninformed decisionmaking."  *Rio Hondo*, 103

F.3d at 452.  SJCA assertion that adverse environmental impacts arise from the

implementation of the CBM production program without the required NEPA analysis

(Randolph Declaration ¶ 14), is sufficient to show causation, *see Wyoming*, 570

F.Supp.2d at 1330 (finding causation where the agency's "failure to consider certain

environmental impacts . . . increased the risk of injury to [the environment] because the

[agency] was proceeding on an uninformed basis").

Like causation, redressibility standards in the NEPA context are "relaxed."  *Rio*

*Hondo*, 102 F.3d at 452; *see also Lujan*, 112 S.Ct. at 2142 n.7 ("The person who has

been accorded a procedural right to protect his concrete interests can assert that right

without meeting all the normal standards for redressibility . . . .").  "[A] plaintiff need not

establish that the ultimate agency decision would change upon [NEPA] compliance."

*Rio Hondo*, 102 F.3d at 452.  Declaring that the FEIS violates NEPA and enjoining

further CBM activities until a sufficient EIS is completed would redress plaintiffs' injuries

"because the federal defendants would then be proceeding on a more informed basis."

*Wyoming*, 570 F.Supp.2d at 1330.

In addition to satisfying the constitutional requisites for standing, a party asserting a NEPA claim must show that its claims fall within the "zone of interest" protected by the Act.[13]  *See National Credit Union Administration v. First National Bank & Trust Co.*, 522 U.S. 479, 488, 118 S.Ct. 927, 933, 140 L.Ed.2d 1 (1998). These standards are met as well.  SJCA's mission includes "organiz[ing] for environmental . . . justice in the San Juan Basin of southwest Colorado and northwest New Mexico," and it has been an "active watchdog of [CBM] extraction practices, operators, and oversight agencies, . . . especially within the San Juan Basin of southwest Colorado."  (Randolph Declaration ¶¶ 5-6.)  Further, Randolph asserts that he personally has "participated in efforts to protect and preserve the exact tracts of public land affected by the Secretary's ongoing oil and gas developments."  (*Id.* ¶ 9.) This evidence is sufficient to show that SJCA's interests come within the "zone of interests" NEPA is designed to protect.  *See Rio Hondo*, 102 F.3d at 448 (noting that NEPA was designed to protect "recreational, aesthetic, and consumptive interests" and "was enacted to protect and promote environmental quality").

In sum, SJCA has demonstrated both constitutional and statutory standing to assert its NEPA claim.[14]

## 2.  FLPMA

In contrast to NEPA's purely procedural role, FLPMA does place substantive

---

[13]  Moreover, because jurisdiction under NEPA presupposes jurisdiction under the APA, plaintiffs must further establish that there has been some "final agency action."  5 U.S.C. § 702.   There is no dispute that the FEIS was a final agency action.

[14]  Because SJCA has established that it has standing, I need not consider standing as to SUGO. *See Earls*, 122 S.Ct. at 2563 n.1.

limits on agency action. For example, FLPMA requires the federal government to develop resource management plans ("RMPs") governing the use of public lands. *See* 43 U.S.C. § 1712(a). These plans describe, among other things, "allowable uses" of the land. *See* 43 C.F.R. § 1601.0-5(n); *see also Pennaco Energy, Inc. v. United States Department of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004) (citing *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 59, 124 S.Ct. 2373, 2377, 159 L.Ed.2d 137 (2004)). Once an RMP has been issued, and allowable uses specified, any future actions must conform to that plan. *See Pennaco Energy*, 377 F.3d at 1151. Because the "procedural injury" analysis outlined above is less useful in the FLPMA context, I analyze plaintiffs' constitutional standing under the more traditional tests used in environmental cases.

The Supreme Court has found that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 183, 120 S.Ct. 693, 705 145 L.Ed.2d 610 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)); *see also Sierra Club v. Tri-State Generation & Transmission Association*, 173 F.R.D. 275, 280 (D. Colo. 1997) ("In an action to enforce environmental laws, impaired aesthetic and environmental interests constitute injury-in-fact as long as the party bringing the action itself suffered or is at risk of suffering the injury."). Here, SJCA has offered evidence that many of its members live within the boundaries of the SUIR, that CBM extraction is

occurring on the SUIR using "environmentally harmful production methods," and that the "adverse environmental impacts" stemming from "the BLM's implementation of its CBM production program in the northern San Juan Basin" harm its members "aesthetic[] and recreational interests in the public lands and the [SUIR] lands impacted by [defendants'] actions." (Randolph Declaration ¶¶ 5, 10, 13 & 14.) This evidence is sufficient to demonstrate an injury to at least some of SJCA's members' aesthetic and recreational interests.

SJCA has also adequately shown causation and redressibility. SJCA's averments that defendants' continued CBM extraction harmed its members' aesthetic and recreational interests show that its injuries are "fairly traceable" to the challenged actions. *See Babbitt*, 137 F.3d at 1202; *see also Tri-State Generation & Transmission Association*, 173 F.R.D. at 280 ("Plaintiff's allegations – that defendants' emissions impair its members' ability to breathe clean air and view natural scenery and wildlife – clearly establish [causation].").  Moreover, the relief plaintiffs seek – cessation of non-conforming CBM extraction, at least until the relevant RMP is properly amended – would "likely redress" the asserted injuries by stopping the allegedly harmful extraction activities. *See Tri-State Generation & Transmission Association*, 173 F.R.D. at 281.

With respect to prudential standing requirements, defendants question, although not specifically in the standing context, whether plaintiffs' FLPMA claim implicates any "final agency action."  Specifically, they argue that plaintiffs have not identified any particular agency decision which violates the relevant RMP, but instead mount a broad

"programmatic challenge" to ongoing CBM activities. This type of challenge, they claim, is precluded by the Supreme Court's decision in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In *Lujan*, the Court found that the plaintiff's challenge to the "continuing . . . operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA" improperly sought "programmatic improvements" rather than attacking particular agency action, and thus was insufficient to confer standing under the APA. *Id.*, 110 S.Ct. at 3189-91.

Plaintiffs do not respond to defendants' argument. Having reviewed the pleadings, I note that defendants may be correct. Plaintiffs do not seem to specifically challenge any one agency action or discrete set of agency actions, but instead argue that *all* CBM-related activities violate FLPMA. (*See, e.g.*, **Petition** at 29 ("BLM has violated FLPMA by allowing continued non-conforming CBM-related activities in the San Juan Basin . . . ."); **Reply** at 12 ("[A]ny and all CBM development activities not envisioned in the RMP are by definition 'non-conforming' . . . .")). This would appear to be the type of programmatic challenge barred by *Lujan*. *See Lujan*, 110 S.Ct. at 3190 ("Respondent alleges that violation of the law is rampant within this program . . . . Perhaps so. But respondent cannot seek wholesale improvement of this program by court decree . . . .").

Nevertheless, because prudential standing, unlike constitutional standing, is not jurisdictional, "'questions relating to prudential standing may be pretermitted in favor of a straightforward disposition on the merits.'" *Finstuen v. Crutcher*, 496 F.3d 1139, 1147

(10th Cir. 2007) (quoting **Grubbs v. Bailes**, 445 F.3d 1275, 1281 (10th Cir.), **cert. denied**, 127 S.Ct. 384 (2006)) (alterations omitted). As I do not have the benefit of plaintiffs' articulation of what specific action or actions they are challenging, and as I am permitted to avoid the prudential standing question all together, I decline to determine whether plaintiffs' FLPMA claim meets the APA's "final agency action" requirement and instead simply resolve that claim on the merits.

### B. SUBSTANTIVE CLAIMS

### 1. FEDERAL LAND POLICY AND MANAGEMENT ACT

The essence of plaintiffs' FLPMA claim is that, because the relevant RMP did not contemplate CBM development, all CBM-related activities are outside of the scope of the RMP and therefore violate FLPMA. **See also** 43 C.F.R. § 1610.5-3(a) (noting that "[a]ll future resource management authorizations and actions" and "subsequent more detailed or specific planning" must conform to the approved RMP). FLPMA, however, expressly does not apply to tribal lands such as the SUIR. **See** 43 U.S.C. § 1712(a) (providing for the development and revision of land use plans "for the use of the public lands"); **id.** § 1702(e)(2) (defining "public lands" to exclude "lands held for the benefit of Indians"). Plaintiffs concede as much, but contend that their FLPMA claim really encompasses lands "on and off the SUIR."

Plaintiffs' argument is belied by their repeated assertions that the focus of their petition is, in fact, the SUIR. (**See Petition**. at 1-2 ("It is the Final EIS for the SUIR . . . that is challenged in this present litigation."); **id.** at 15 (noting that plaintiffs seek "injunctive relief barring all ongoing oil and gas development and related activities being

undertaken in reliance on the unlawful SUIR FEIS"); *id.* at 29 ("BLM has violated FLPMA by allowing continued non-conforming CBM-related activities in the San Juan Basin, and specifically on the SUIR . . . .")).  Indeed, in the very section of their reply brief in which plaintiffs argue that their FLPMA claim is a broader challenge to CBM development outside the SUIR, they again acknowledge that "the present motion most directly challenges the SUIR FEIS."  (Reply at 13; *see also id.* ("The fact that such extensive CBM development is able to occur within the San Juan Basin, albeit confined within the boundaries of the SUIR, without any attention whatsoever to the fact that this is a non-conforming use, highlights the inadequacy of BLM's segregated approach.")).

I find that, at least in the context of the present petition, plaintiffs' challenge is fairly read to be restricted to the SUIR lands and the SUIR FEIS.  As FLPMA undisputedly does not apply to those lands, plaintiffs' FLPMA claim must be dismissed.

### 2.  NATIONAL ENVIRONMENTAL POLICY ACT

As noted above, NEPA is quintessentially a procedural statute.  NEPA "'prescribes the necessary process' by which federal agencies must 'take a "hard look" at the environmental consequences' of the proposed courses of action."  *Pennaco Energy*, 377 F.3d at 1150 (quoting *Utahns for Better Transportation v. United States Department of Transportation*, 305 F.3d 1152, 1162-63 (10th Cir. 2002), *on reh'g*, 319 F.3d 1207 (10th Cir. 2003)).  To help ensure that this "hard look" occurs, for "major" actions that will "significantly affect[ ] the quality of the human environment," NEPA requires the preparation of an EIS that considers the environmental impact of, as well as alternatives to, the proposed action.  *See* 42 U.S.C. § 4332(C).  "'[O]nce

environmental concerns are "adequately identified and evaluated" by the agency, NEPA places no further constraint on agency actions.'" *Pennaco Energy*, 377 F.3d at 1150 (quoting *Friends of the Bow*, 124 F.2d at 1213). In other words, NEPA "'prohibits uninformed – rather than unwise – agency action.'" *Dombeck*, 185 F.3d at 1172 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989)).

Consistent with the courts' generally deferential review of agency action, "[i]n reviewing the adequacy of a final environmental impact statement we merely examine 'whether there is a reasonable, good faith, objective presentation of the topics [the National Environmental Policy Act] requires an [environmental impact statement] to cover.'" *Dombeck*, 185 F.3d at 1172 (quoting *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 (10th Cir. 1992)) (alterations in original). A court's objective is not to "fly speck" the EIS, but to "make a 'pragmatic judgment whether the [environmental impact statement]'s form, content and preparation foster both informed decision-making and informed public participation.'" *Id.* (quoting *Oregon Enviornmental Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987)) (alterations in original).

Plaintiffs first argue that the FEIS fails to adequately address the cumulative impacts of oil and gas activity throughout the San Juan Basin. This argument is further subdivided into two separate but related arguments concerning the FEIS's assessment of cumulative impacts: (1) that the oil and gas development activities throughout the Basin are sufficiently related such that they should have been considered in one single,

"Basin-wide" EIS; and (2) that even if preparing an EIS solely for the SUIR was appropriate, the SUIR FEIS's "cumulative impacts analysis" insufficiently considered Basin-wide environmental effects.

In **Kleppe v. Sierra Club**, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the Supreme Court recognized that a "comprehensive" impact statement – one that considers numerous pending proposals in one document – may sometimes be appropriate and satisfy the requirements of NEPA. **Id.**, 96 S.Ct. at 2730 ("[W]hen several proposals for [ ] actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action."). This principle is echoed in the relevant regulations, which provide that the agency is to determine whether other actions are "connected," "cumulative," or "similar" to the action being evaluated. Connected actions – those that are "closely related" to the proposed action – and cumulative actions – those that "have cumulatively significant impacts" – "should" be discussed in the same EIS. 40 C.F.R. § 1508.25(a)(1)-(2). Similar actions – those with commonalities "that provide a basis for evaluating their environmental consequences together" – "may" be considered in the same EIS. **Id.** § 1508.25(a)(3). Importantly, the **Kleppe** Court prescribed a highly deferential standard of review of an agency's decision as to the scope of an EIS:

> The determination of the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and

practical considerations of feasibility.  Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies.  Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.

*Kleppe*, 96 S.Ct. at 2731.  As noted earlier, the San Juan Basin has been subdivided into three areas for the purpose of NEPA review:  the SUIR, the lands north of the SUIR, and the New Mexico portion of the Basin.  A separate EIS was prepared for each region.  Pursuant to *Kleppe*, unless this decision was arbitrary, it must be upheld.

Plaintiffs first contend that oil and gas development throughout the Basin meets the NEPA regulations' definition of "connected" action and thus should have been considered in a single EIS.  However, actions are "connected" only if they (1) "[a]utomatically trigger other actions which may require environmental impact statements;" (2) "[c]annot or will not proceed unless other actions are taken previously or simultaneously;" or (3) "[a]re interdependent parts of a larger action and depend on the larger action for their justification."  40 C.F.R. § 1508.25(a)(1).  The Tenth Circuit applies an "independent utility" test to evaluate "'whether multiple actions are so connected as to mandate consideration in a single EIS.'"  *Wilderness Workshop v. United States Bureau of Land Management*, 531 F.3d 1220, 1228 (10th Cir. 2008).  "'The crux of the test is whether each of two projects would have taken place with or without the other and thus had independent utility.'"  *Id.* (quoting *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006)).

Plaintiffs offer no real argument to show how the myriad oil and gas projects throughout the Basin meet this definition.  Moreover, the administrative record

demonstrates that new oil and gas wells would have been developed in the SUIR regardless of activities elsewhere. (AR CD 1, Doc 189 (Record of Decision) at 1111) ("Oil and gas decisions within the SUIT EIS Study Area do not derive from, nor are they dependent on development actions within the remainder of the San Juan Basin."). Thus, I find and conclude that development projects outside the SUIR are not so connected to those within the SUIR that they had to be considered in a Basin-wide EIS.

Plaintiffs also argue that, because Basin-wide oil and gas development projects will have cumulative environmental effects, a single EIS was required. However, although the *Kleppe* Court recognized that actions with cumulative effects should be considered together, it also acknowledged that "practical considerations" may necessitate restricting a statement's scope. *Kleppe*, 96 S.Ct. at 2730-231. Thus, while it may be true, as plaintiffs argue, that the natural resources in question are located throughout the Basin and exist "with no regard for political boundaries," that fact is not dispositive of the question whether a single EIS was required. *See id.* at 2732 ("Even if environmental interrelationships could be shown conclusively to extend across basins and drainage areas, practical considerations of feasibility might well necessitate restricting the scope of the comprehensive statements.").[15] Courts have noted various

_____

[15] Plaintiffs cite to several other cases in support of their argument that the cumulative impact of Basin-wide oil and gas development requires a single EIS. (*See* **Petition** at 20.) However, these cases are readily distinguishable. They address either the authority of an agency to decline to prepare an EIS at all, *see* **Blue Mountains Biodiversity Project v. Blackwood**, 161 F.3d 1208, 1215 (9th Cir. 1998), **cert. denied**, 119 S.Ct. 2337 (1999); **Park County Resource Council v. United States Department of Agriculture**, 817 F.2d 609, 623 (10th Cir. 1987), or the question whether the cumulative impact analysis in an individual EIS sufficiently considered regional action, **see City of Tenakee Springs v. Clough**, 915 F.2d 1308, 1312 (9th Cir. 1990); **Oregon Natural Resources Council v. Marsh**, 832 F.2d 1489, 1498 (9th Cir. 1987). None of these cases required what plaintiffs seek here – preparation of a single EIS when an agency has determined to prepare multiple EISs instead.

practical considerations that may justify a limited scope of agency review, including (1)

whether the boundaries relied on by the agency for the segmented EIS predated the

agency's review, ***Earth Island Institute v. United States Forest Serv.***, 351 F.3d 1291,

1305 (9th Cir. 2003); (2) whether the individual agency environmental reviews

proceeded on separate timelines, ***id.***; (3) whether the scope of the agency's studies

differed, ***Northern Plains Resource Council***, 2005 U.S. Dist. LEXIS 4678, at *34 (D.

Mont. Feb. 25, 2005); and (4) the number of agencies involved in the preparation of the

various EISs, ***id.*** at *35.

Such practical considerations exist here.  For example, the boundaries of the

SUIR long predated the FEIS.  (***See, e.g.***, FEIS at 3-115.)  Moreover, the record

suggests that differences in the geology of the Basin make segmented review rational.

(***See id.*** at 4-275 to 4-276) (noting that "the physical surface environment is different

north of the Reservation" and that "[t]he New Mexico portion of the San Juan Basin is

different in many respects from the Colorado portion of the Basin").  The timing of the

reviews of the three areas also proceeded on distinctly different timelines; the process

of developing new EISs for the New Mexico portion of the Basin and the Colorado

portion north of the SUIR had just begun when the SUIR FEIS was published.  (***See id.***

at 2-8.)  Finally, and perhaps most important, the special duties owed by the federal

government to the Tribe was a driving factor in preparing a SUIR-specific EIS.[16]  (***See,***

---

[16]  As both defendants and intervenors note, the federal government owes a trust duty to the Tribe
to act in the Tribe's best interest, and this duty is a relevant factor when making administrative and policy
decisions.  ***See generally***, ***Jicarilla Apache Tribe v. Supron Energy Corp.***  728 F.2d 1555, 1567 (10th
Cir. 1984) (Seymour, J., concurring in part and dissenting in part) ("When the Secretary [of the Interior] is
acting in his fiduciary role rather than solely as a regulator and is faced with a decision for which there is
more than one 'reasonable' choice as that term is used in administrative law, he must choose the
alternative that is in the best interests of the Indian tribe."), ***on reh'g en banc***, 782 F.2d 855 (10th Cir.

*e.g.*, AR CD 1, Doc 189 at 1111) ("NEPA requires analysis and presentation of impacts in such a manner that the decisionmaker can make informed and environmentally sound decisions. We believe this requirement is best satisfied for oil and gas development on the Reservation where [the federal government] ha[s] a trust responsibility, by focusing this EIS on the specific actions and needs of the [Tribe] . . .").

With these considerations in mind, it was certainly reasonable to limit the scope of the EIS to the SUIR. While it might have been similarly reasonable to consider the cumulative effects of Basin-wide oil and gas development in a single EIS, I cannot say that it was arbitrary and capricious not to do so.

Plaintiffs further argue that the oil and gas development projects throughout the Basin are "similar" actions for which a comprehensive EIS should have been prepared. *See* 40 C.F.R. § 1508.25(a)(3) (defining "similar actions")); 46 Fed. Reg. 18,025, 18,033 (March 23, 1981) ("The preparation of an area-wide or overview EIS may be particularly useful when similar actions, viewed with other reasonably foreseeable or proposed agency actions, share common timing or geography."). However, nothing in the relevant regulations compels the preparation of a single EIS for "similar" actions. 40 C.F.R. § 1508.25(a)(3) (noting that an agency "may wish to analyze [similar] actions in the same impact statement"); 46 Fed. Reg. at 18,033 (noting that a single EIS "may be particularly useful" in certain circumstances). Indeed, "[a]n agency . . . has even more discretion to decide whether to complete a single [EIS] when 'similar' actions are concerned than when 'cumulative' actions are involved." ***Northern Plains Resource***

_____

1986) (adopting dissenting opinion), *as modified*, 793 F.2d 1171 (10th Cir. 1986) .

*Council*, 2005 U.S. Dist. LEXIS at *36. Even assuming *arguendo* that Basin-wide oil and gas development was sufficiently similar to invoke these regulations, meaning that defendants could have considered the projects together, it was not unreasonable for them to decline to do so.

Finally, plaintiffs contend that a single EIS was necessary to appropriately evaluate what they contend is "relatively new technology" used in enhanced production methods. Although not spelled out, presumably their argument is that use of invasive extraction technologies over a geographically contiguous area adds weight to the contention that Basin-wide oil and gas development is similar action, having cumulative impact, and thus should be considered in a single analysis. Plaintiffs point to no authority suggesting that the mere fact that similar technologies are being used requires the preparation of a Basin-wide EIS. Given the discretion due defendants in determining the scope of an EIS, and for all the reasons cited above, the fact that similar extraction technology may be being used throughout the Basin does not make the decision to restrict the FEIS to the SUIR an impermissible or arbitrary one.[17]

Plaintiffs further contend that, even if segmented EISs are permissible, the SUIR

---

[17]  Underlying the rules requiring multiple actions to be considered together is the concern that agencies could otherwise artificially subdivide "major" federal actions into small, individually insignificant projects and thereby avoid the NEPA process altogether. ***See, e.g.*, *Citizens' Committee to Save Our Canyons***, 297 F.3d at 1028 ("One of the primary reasons for requiring an agency to evaluate 'connected actions' in a single EIS is to prevent agencies from minimizing the potential environmental consequences of a proposed action (and thus short-circuiting NEPA review) by segmenting or isolating an individual action that, by itself, may not have a significant environmental impact."); ***Hirt v. Richardson***, 127 F. Supp. 2d 833, 841-42 (W.D. Mich. 1999) (noting that the rules on connected, cumulative, and similar actions exist to avoid "impermissible segmentation"; "Impermissible segmentation involves a 'major federal action' where a small part of that action has been 'segmented' in order to escape application of the NEPA process."). This is not such a case. Here, the NEPA process was followed – indeed, it was followed multiple times, as impact statements were prepared for all three segments of the Basin. Under these circumstances, it was not arbitrary or capricious for defendants to evaluate oil and gas development in the Basin by way of several EISs instead of one.

FEIS still is deficient in its consideration of the cumulative effects of Basin-wide oil and gas development. Plaintiffs argue that the cumulative impact assessment does little more than recognize the oil and gas development throughout the Basin – that is, it fails to take the required "hard look" at the actual cumulative impact of those actions.

Cumulative impacts must be assessed in an individual EIS.[18] "Even if a single, comprehensive EIS is not required, the agency must still adequately analyze the cumulative effects of the project within each individual EIS." *Earth Island*, 351 F.3d at 1306; *see also Dombeck*, 304 F.3d at 896 (9th Cir. 2002) ("'[T]he obligation to wrap several cumulative action proposals into one EIS for decision making purposes is separate and distinct from the requirement to consider in the environmental review of one particular proposal, the cumulative impact of that one proposal when taken together with other proposed or reasonably foreseeable actions.'") (citation omitted). The Tenth Circuit "'appl[ies] a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a FEIS are merely flyspecks, or are significant enough to defeat [NEPA's] goals of informed decision making and informed public comment.'" *Fuel Safe Washington v. F.E.R.C.*, 389 F.3d 1313, 1323 (10th Cir. 2004) (quoting *Utahns for Better Transportation*, 305 F.3d at 1163). "NEPA does not

---

[18] "Cumulative impact" is defined by regulation as

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

require that an agency discuss every impact in great detail; it simply requires a reasoned evaluation of the relevant factors." *Forest Guardians v. United States Forest Service*, 495 F.3d 1162, 1172 (10th Cir. 2007). The analysis need not be a "model of clarity or thoroughness," *Fuel Safe Washington*, 389 F.3d at 1331, but cannot be "completely devoid of any substantive discussion" of cumulative effects, *Wyoming*, 570 F.Supp.2d at 1341-42 (D. Wyo. 2008). In short, a court is not to "'question the wisdom of the [agency's] ultimate decision or its conclusion concerning the magnitude of indirect cumulative impacts,'" but rather must only "'examine the administrative record, as a whole, to determine whether the [agency] made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making.'" *Fuel Safe Washington*, 389 F.3d at 1331 (quoting *Dombeck*, 185 F.3d at 1176).

Here, the FEIS contains over three hundred pages of analysis of the environmental effects of the proposed oil and gas development on the SUIR, including a detailed analysis of cumulative impacts on various environmental and socioeconomic factors. (*See* FEIS at 4-1 to 4-306 (environmental effects analysis); *id.* at 4-272 to 4-304 (cumulative impacts analysis)). The cumulative impacts analysis considered a number of other actions, including specifically existing oil and gas development and "other reasonably foreseeable oil and gas development in the San Juan Basin (with emphasis on development on non-Tribal land within the Study Area)."[19] (*Id.* at 4-272 to

---

[19] The Study Area consists of 421,000 acres "within the exterior boundaries of the [SUIR]." (FEIS at ES-1.) Plaintiffs contend that, because the cumulative impacts analysis admittedly emphasized the Study Area, the analysis "neglect[ed]" the oil and gas development within the broader Basin. However that is simply not the case. As detailed below, the cumulative impacts analysis contains substantial

4-273.)  The analysis specifically noted the "more than 26,000 wells [currently] in the San Juan Basin," and defined the "reasonably forseeable oil and gas development" to include "development in the San Juan Basin north of the Study Area (346 new CBM wells)" and "development in the New Mexico portion of the San Juan Basin (CBM, conventional gas, and oil)."  (*Id.* at 4-273; *see also id.* at 4-275 to 4-277 (explaining in detail oil and gas development north of the SUIR and in the New Mexico portion of the Basin)).  The cumulative impacts analysis further assessed the impacts of these other actions on a variety of environmental and socioeconomic factors.  (*See id.* at 4-282 to 4-302.)

Plaintiffs do not explain in any detail what specific analyses they find lacking, but rather argue generally that the cumulative impacts analysis "fails to take a hard look at the actual impacts of" Basin-wide development.  I disagree.  The FEIS repeatedly considered the impacts of Basin-wide oil and gas projects.  For example, in discussing cumulative impacts on air quality, the FEIS noted that "[n]one of the other foreseeable development projects in the area would degrade air quality significantly."  (*Id.* at 4-283.)  Similarly, the FEIS detailed the effect on biological resources from continued oil and gas development both in the northern and New Mexico portions of the Basin.  (*Id.* at 4-289 to 4-291.)  It also examined the "cumulative impact of the reasonably foreseeable projects on geology, minerals, and soils," and specifically evaluated whether development of additional wells Basin-wide could prevent loss of gas resources.  (*Id.* at 4-291 to 4-292.)  As for the effects on water resources and land use, the FEIS took into

discussion of Basin-wide effects.

account oil and gas development both within the Study Area and in the northern San Juan Basin. (*Id.* at 4-293 (noting that "[t]he total volume of fresh water needed for all oil and gas development in the Colorado portion of the San Juan Basin is estimated to be about 81 acre-feet per year, or three times the 27 acre-feet per year needed for the Agency's and Tribe's Preferred Alternative"); *id.* at 4-294 (noting that "[t]he direct impact [on land use] associated with past and future CBM development in the northern San Juan Basin equals about 2,200 acres")). Traffic and cultural resources are similarly evaluated with reference to development both north of the SUIR and in the New Mexico portion of the Basin. (*Id.* at 4-294 to 4-296.)

This consideration of the effects of broader oil and gas development is adequate to foster informed participation and intelligent decisionmaking. While at times the cumulative impacts analysis may not be a "model of clarity or thoroughness," *see Fuel Safe Washington*, 389 F.3d at 1331, it is a sufficiently reasonable, good faith presentation of the broader impacts of oil and gas development throughout the Basin.[20] NEPA requires no more.

In a related argument, plaintiffs contend that the FEIS is insufficient because it impermissibly deferred the cumulative impact analysis "to future NEPA processes associated with site-specific development." Implicit in this argument is an assumption that the FEIS contained little or no analysis of cumulative impacts. *See id.* ("An agency

---

[20] It is certainly true that the analysis does not always look Basin-wide to evaluate a specific environmental effect. (*See, e.g.*, FEIS at 4-293 (looking only to the northern Basin in evaluating water resources)). However, the purpose of my review is not to "question . . . [the agency's] conclusion concerning the magnitude of indirect cumulative impacts." *Forest Guardians*, 495 F.3d at 1172. Plaintiffs point to nothing in the record that suggests defendants did not have a reasonable basis for the scope of their evaluations.

may not avoid an obligation to analyze in an EIS environmental consequences that foreseeably arise from [certain agency action] merely by saying that the consequences are unclear or will be analyzed later when an EA is prepared for a site-specific program . . . ."). Such is not the case here. The SUIR FEIS contains a substantial discussion of cumulative environmental impacts. That defendants will further analyze cumulative impacts later, in connection with site-specific projects, is not only permissible, but expressly encouraged. *See* 40 C.F.R. §§ 1502.20 & 1508.28 (encouraging "tiering," which is "the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared"); *see also Park County Resource Council v. United States Department of Agriculture*, 817 F.2d 609, 623 (10th Cir. 1987) ("The tiered approach to environmental review, generally condoned in the regulations, . . . is calculated to provide the most informed decision making possible in oil and gas leasing.").

Plaintiffs also point to a statement in the SUIR FEIS noting that the EISs for the northern and New Mexico portions of the Basin "will contain comprehensive cumulative-impact and mitigation analyses" (FEIS at 2-8), to argue that defendants chose not to "thoroughly consider Basin-wide cumulative impacts" in the SUIR FEIS. I do not read the referenced language to mean that defendants deferred such analysis to those subsequent EISs, only that those EISs also should consider cumulative impacts.

Multiple reviews of cumulative impacts certainly does not run afoul of NEPA's requirements.

For all of these reasons, and particularly in light of the deferential standard of review, I find that the assessment of Basin-wide cumulative impacts is not arbitrary or capricious.[21]

In a second argument, plaintiffs claim that the FEIS's "alternatives" analysis was deficient. Under NEPA, the "heart" of the EIS is an analysis of alternatives to the proposed action. 40 C.F.R. § 1502.14. Among other things, the relevant regulations require an EIS to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated," to "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits," and to "[i]nclude the alternative of no action." *Id.* §§ 1502.14(a), (b) & (d).

However, consistent with the general principles of review of agency action, my evaluation of defendants' alternatives analysis is appropriately deferential. In determining whether an agency's analysis was arbitrary, a court employs a "rule of reason and practicality." *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th Cir. 1996). This "reasonableness" standard "applies both to which alternatives the agency discusses and the extent to which it discusses them." *Utahns*

_____

[21] Intervenors argue that Basin-wide oil and gas activities need not be reviewed in the analysis at all, as they do not meet the Tenth Circuit's definition of cumulative impacts. However, as explained above, the FEIS expressly considered these activities. I thus need not consider whether the hypothetical omission of such activities would have been permissible.

*for Better Transportation*, 305 F.3d at 1166. NEPA "'does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective.'" *Dombeck*, 185 F.3d at 1174 (quoting *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992)) (alteration in original). "'What is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned.'" *Id.* (quoting *All Indian Pueblo Council*, 975 F.2d at 1444).

Plaintiffs raise three challenges to the SUIR FEIS's discussion of alternatives: (1) that it fails to consider a true "no action" alternative; (2) that it arbitrarily rejects a Basin-wide EIS alternative; and (3) that it misleadingly dismisses, and therefore fails to analyze the impacts of, an alternative permitting more dense well spacing. None of these arguments ultimately has traction.

The purpose of a "no action" alternative is to allow agencies to "compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo." *Custer County Action Association v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001), *cert. denied*, 122 S.Ct. 1063 (2002). The SUIR FEIS's no action alternative represents a continuation of the present management of the SUIR's oil and gas development under the 1990 EA. This alternative permits 350 new wells, including 81 CBM wells. (FEIS at 2-9.) The FEIS expressly notes that some of these wells would be "infill development" (*id.*), which means that the wells could be drilled closer together than the one-well-per-320-acres spacing standard that was evaluated in the 1990 EA. Plaintiffs argue that because no prior environmental analysis envisioned

35

this increased density, this alternative contemplates a change from the status quo and therefore action.

The problem with plaintiffs' argument is that the status quo *does* include well spacing at less than 320 acres. As plaintiffs acknowledge, as early as 1992, applications to double well density to two wells per 320 acres were submitted and approved. Indeed, plaintiffs themselves specifically challenged, albeit without success, an order permitting 160-acre spacing for drilling CBM wells on the SUIR. **See San Juan Citizens Alliance**, 129 IBLA 1, 2 (1994).

Plaintiffs seek to avoid this issue by arguing that infill development has never been subject to a full-blown NEPA analysis, and thus an alternative allowing infill drilling cannot be considered a true no action alternative. The Tenth Circuit has considered and rejected just such an argument. In **Custer County Action Association**, the court reviewed an EIS that modified certain military flight paths – so-called "military training routes" ("MTRs") and "military operations areas" ("MOAs") – for the Colorado Air National Guard ("ANG"). 256 F.3d at 1028-29. Petitioners argued that the EIS's "no-action" alternative was inadequate because the ANG's then-current flight paths, which were the basis for the no-action alternative, had "never been properly subject to environmental review." *Id.* at 1040. In rejecting this argument, the Tenth Circuit noted that the status quo properly included an assessment of the then-existing MTRs and MOAs, regardless whether those flight paths had previously received NEPA review:

> In requiring consideration of a no-action alternative, the [relevant regulations] intended that agencies compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo. In other

words, the current level of activity is used as a benchmark. This is exactly what the ANG and FAA did. The Final Environmental Impact Statement demonstrates the ANG and FAA compared the impacts of the original proposal and preferred alternative to the impacts of continuing to fly in the existing MTRs and MOAs. This is all the law requires. The requirement to consider a no-action alternative does not provide Petitioners a vehicle in which to pursue allegations that past ANG or FAA actions received insufficient environmental analysis. The time has passed to challenge past actions.

*Id.* (citations omitted). As in ***Custer***, it is undisputed here that the "current level of activity" in the SUIR includes infill drilling. Whether that drilling was subject to a sufficient NEPA review is not the issue. The SUIR FEIS's no action alternative is therefore patently reasonable.

In addition to the options considered in detail, the SUIR FEIS noted several alternatives that it considered but did not thoroughly analyze, including an alternative to develop a Basin-wide EIS. (***See*** FEIS at 2-7 to 2-8.) Conceptually, elimination of alternatives is permissible, so long as the agency provides a reasonable explanation for doing so. ***See*** 40 C.F.R. § 1502.14(a) (noting that agencies should "briefly discuss the reasons for" eliminating certain alternatives from detailed study). Here, the FEIS expressly noted that it was not considering this alternative in detail because "a basinwide EIS would not provide tribal leaders and the trust agencies with the specific, focused analysis needed to understand oil and gas development within the SUIT Study Area," and that "a basinwide EIS would be so general by necessity that it would lose the necessary focus on development of resources within the Reservation." (FEIS at 2-8.) Plaintiffs' challenge to the elimination of this alternative is little more than a rehashing of

their argument that a single EIS should have been required.  As discussed in detail above, such a decision was not arbitrary.  For all of the same reasons, elimination of the Basin-wide EIS alternative was reasonable.

Another alternative considered but not analyzed in detail addressed the possibility of well densities of one well per 80 acres – a greater density than the spacing contemplated by the alternatives analyzed in detail.  (***See id.*** at 2-8 to 2-11.)  The 80-acre option was rejected based on an assessment that "production and reservoir characteristics, as they are currently understood, indicate it is not optimum spacing for the prevention of waster and maximization of ultimate recovery."  (***Id.*** at 2-9.)  In other words, "[t]he alternative was eliminated from further detailed consideration because it is not practical or expected."  (***Id.***)

Plaintiffs contend that this decision was faulty because beginning in 2005 – three years after the publication of the FEIS – industry groups began making requests for permission to drill at an 80-acre density.  Defendants and intervenors argue that I should not consider this post-decision evidence.  As a general matter, decisions "must be reviewed on the basis articulated by the agency and on the evidence and proceedings before the agency at the time it acted."  ***American Mining Congress v. Thomas***, 772 F.2d 617, 626 (10th Cir. 1985), ***cert. denied***, 106 S.Ct. 2275, ***and cert. denied***, 106 S.Ct. 2276 (1986).  However, an exception to this rule has been recognized for materials that  "demonstrate[ ] that the actions were right or wrong."  ***Id.***

Plaintiffs urge that these extra-record applications prove just that.  Nevertheless,

and assuming *arguendo* that the 2005 applications are properly reviewable,[22] they do not demonstrate that the decision made three years earlier was wrong.  In other words, they do not prove that rejection of the 80-acre alternative was not a good faith determination that, at the time of the decision, 80-acre spacing was "too remote, speculative, or . . . impractical."  ***Dombeck***, 185 F.3d at 1174.  Exclusion of the 80-acre well density alternative was not unreasonable.

## IV.  CONCLUSION

For all these reasons, defendants' promulgation of the SUIR FEIS was not arbitrary or capricious.

## V.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That plaintiffs' **Petition for Review of Agency Action** [#158] is **DENIED**;

2.  That the decision of the United States Bureau of Land Management challenged herein is **AFFIRMED**;

3.  That judgment **SHALL ENTER** on behalf of defendants, Ken Salazar, Secretary, United States Department of the Interior, and United States Bureau of Land Management, and intervenors, Southern Ute Indian Tribe and Amoco Production Company, against plaintiffs, San Juan Citizens' Alliance and Southern Ute Grassroots' Organization, as to all claims for relief and causes of action;

4.  That plaintiffs' claims against defendants and intervenors are **DISMISSED**

---

[22] I have serious doubts that they are, given that "any exception to th[e] general rule against the use of extra-record materials must be extremely limited."  ***American Mining Congress***, 772 F.2d at 626.

**WITH PREJUDICE**; and

5.  That defendants and intervenors are **AWARDED** their costs, to be taxed by

the Clerk of the Court in the time and manner required by Fed.R.Civ.P.54(d)(1) and

D.C.COLO.LCivR 54.1.

Dated March 30, 2009, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge